**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| THE SATANIC TEMPLE, INC. and MORTIMER ADRAMELECH,<br>*Plaintiffs*,<br>v.<br>MARK CAMPBELL, DIRECTOR OF THE IOWA DEPARTMENT OF ADMINISTRATIVE SERVICES, in his official and individual capacities, ADAM STEEN, FORMER DIRECTOR OF THE IOWA DEPARTMENT OF ADMINISTRATIVE SERVICES, in his individual capacity, and THE IOWA DEPARTMENT OF ADMINISTRATIVE SERVICES,<br>*Defendants*. | Case No. 4:26-cv-336-SMR-HCA<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ii
INTRODUCTION 1
BACKGROUND 2
I. Iowa's Department of Administrative Services Regulates Use of the Capitol. 2
II. DAS Denies the Satanists' 2024 Application to Hold a Krampus Costume Contest at the Capitol Rotunda. 2
III. DAS Denies the Satanists' 2025 Application for the Krampus Costume Contest. 5
IV. The Satanists Sue to Hold the Krampus Costume Contest in December 2026. 6
LEGAL STANDARD 6
ARGUMENT 7
I. The Satanists Are Not Likely To Succeed On The Merits. 7
A. The Satanists are not likely to succeed on their free speech claim. 7
B. The Satanists are not likely to succeed on their free exercise claim. 15
C. The Satanists forfeited their equal protection claim and are unlikely to succeed on the merits regardless. 17

**TABLE OF CONTENTS (cont'd)**

**Page(s)**

D. The Satanists are not likely to succeed on their state law claims. .............................. 17
II. The Other Factors Weigh Against the Satanists' Requested Relief. ................................. 19
III. The Satanists Must Post an Injunction Bond Before Any Injunction Takes Effect. ......... 20
CONCLUSION .......................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Able v. United States*,
44 F.3d 128 (2d Cir. 1995) .......... 6, 7

*Adam & Eve Jonesboro, LLC v. Perrin*,
933 F.3d 951 (8th Cir. 2019) .......... 17

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) .......... 8, 11

*B.W.C. v. Williams*,
990 F.3d 614 (8th Cir. 2021) .......... 15

*Ball v. City of Lincoln*,
870 F.3d 722 (8th Cir. 2017) .......... 11, 12

*Brandt ex rel. Brandt v. Griffin*,
147 F.4th 867 (8th Cir. 2025) .......... 14

*Brown v. Ark. Dep't of Fin. & Admin.*,
180 F. Supp. 3d 602 (W.D. Ark. 2016) .......... 19

*Cantwell v. Connecticut*,
310 U.S. 296 (1940) .......... 17

*Cavanaugh v. Bartelt*,
178 F. Supp. 3d 819 (D. Neb. 2016) .......... 15

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*,
561 U.S. 661 (2010) .......... 10, 12

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .......... 16

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) .......... 7, 8, 9, 14, 16

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109 (8th Cir. 1981) .......... 7

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .......... 16

*Ginsberg v. New York*,
390 U.S. 629 (1968) .......... 10, 14, 20

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
452 U.S. 640 (1981) .......... 10

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*Hill v. Xyquad, Inc.*,
939 F.2d 627 (8th Cir. 1991) ........ 20

*Home Instead, Inc. v. Florance*,
721 F.3d 494 (8th Cir. 2013) ........ 7

*Johnson v. Bayens*,
2020 WL 12618873 (S.D. Iowa Dec. 10, 2020)........ 9

*Kiray v. Hy-Vee, Inc.*,
716 N.W.2d 193 (Iowa Ct. App. 2006) ........ 18

*Lubavitch of Iowa, Inc. v. Walters*,
684 F. Supp. 610 (S.D. Iowa 1988)........ 9

*Lubavitch of Iowa, Inc. v. Walters*,
873 F.2d 1161 (8th Cir. 1989) ........ 7, 11

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988)........ 15

*Maryland v. King*,
567 U.S. 1301 (2012)........ 20

*Monroe v. Ark. State Univ.*,
495 F.3d 591 (8th Cir. 2007) ........ 7

*Murthy v. Missouri*,
603 U.S. 43 (2024)........ 7

*New Doe Child #1 v. United States*,
901 F.3d 1015 (8th Cir. 2018) ........ 19

*Niemotko v. Maryland*,
340 U.S. 268 (1951)........ 15

*Nken v. Holder*,
556 U.S. 418 (2009)........ 20

*Ochs v. Thalacker*,
90 F.3d 293 (8th Cir. 1996) ........ 15

*Org. for Black Struggle v. Ashcroft*,
978 F.3d 603 (8th Cir. 2020) ........ 20

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984)........ 17, 18

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983)........ 8, 13

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
530 F.3d 724 (8th Cir. 2008) ........ 6, 7, 19

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*Powell v. Noble*,
798 F.3d 690 (8th Cir. 2015) .................................................................. 7, 8, 10, 11, 12, 20

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
826 F.3d 1030 (8th Cir. 2016) .................................................................................... 20

*Robb v. Hungerbeeler*,
370 F.3d 735 (8th Cir. 2004) ...................................................................................... 13

*Satanic Temple v. City of Belle Plaine*,
80 F.4th 864 (8th Cir. 2023) ................................................ 10, 12, 13, 15, 16, 17, 19

*Satanic Temple v. City of Belle Plaine*,
475 F. Supp. 3d 950 (D. Minn. 2020)......................................................................... 17

*Satanic Temple, Inc. v. City of Boston*,
111 F.4th 156 (1st Cir. 2024)....................................................................................... 19

*Satanic Temple, Inc. v. City of Scottsdale*,
856 F. App'x 724 (9th Cir. 2021) ................................................................................ 16

*Satanic Temple, Inc. v. Saucon Valley Sch. Dist.*,
671 F. Supp. 3d 555 (E.D. Pa. 2023)........................................................................... 13

*Schall v. Martin*,
467 U.S. 253 (1984) .................................................................................................... 14

*Sessler v. City of Davenport*,
102 F.4th 876 (8th Cir. 2024) ........................................................................................ 8

*Smith v. Reynolds*,
139 F.4th 631 (8th Cir. 2025) ...................................................................................... 17

*United States v. Nassif*,
97 F.4th 968 (D.C. Cir. 2024)......................................................................................... 9

*Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*,
640 F.3d 329 (8th Cir. 2011) ........................................................................ 7, 8, 10, 11, 13

*Viewpoint Neutrality Now! v. Bd. of Regents of Univ. of Minn.*,
109 F.4th 1033 (8th Cir. 2024) ................................................................................. 8, 11

**Statutes**

Iowa Code § 8A.322 ..................................................................................................... 2, 7, 8

Iowa Code § 216.7 .............................................................................................................. 18

Iowa Code § 216.16 .............................................................................................................. 6

Iowa Code § 675.3 ......................................................................................................... 18, 19

Iowa Code § 675.4 .............................................................................................................. 18

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

**Rules**

Fed. R. App. P. 41 .......... 20

Fed. R. Civ. P. 65 .......... 20

**Regulations**

Iowa Admin. Code r. 11-100.1 .......... 10, 12

Iowa Admin. Code r. 11-100.2 .......... 8, 9, 10, 12

Iowa Admin. Code r. 11-100.4 .......... 2, 7, 9, 18, 20

Iowa Admin. Code r. 161-3.26 .......... 6

Iowa Admin. Code r. 161-3.43 .......... 6

**Other Authorities**

Tanya Basu, *What Is Krampus? This Is the Real Story of the Christmas Beast*, Nat'l Geographic (Dec. 5, 2018) .......... 4

*Capitol Tours & Resources*, Iowa Legislature .......... 2, 8

Sophie-Claire Hoeller, *The Story Behind 'Krampus,' Santa's Demonic Helper Who Exists to Scare Children into Being Good*, Business Insider (Dec. 5, 2015) .......... 4

Brittany Lyte, *Kaua'i Christmas Parade Float Sparks Uproar Over 'Demonic' Theme*, Honolulu Civ. Beat (Dec. 15, 2025) .......... 4

Philip Oltermann, *Austria Struggles with Marauding Krampus Demons Gone Rogue*, The Guardian (Dec. 8, 2019) .......... 4

Johannes Pleschberger, *Austria's Krampus Parades Too Violent for Insurance Companies,* CGTN (Dec. 15, 2022) .......... 4

Johanna Urbancik, *Krampus Parades Turn Violent: Traditional Festivities Spark Debate Over Safety and Gendered Violence*, Euronews (Dec. 3, 2024) .......... 4, 10

*Video and Pictorial Tours of the Capitol and Capitol Grounds*, Iowa Legislature .......... 2

Laurel Zwissler, *Religiously Nonreligious: The Secular Activism of The Satanic Temple*, 14 Religion & Society 168 (2023) .......... 3, 11, 15

## INTRODUCTION

The Satanic Temple and Mortimer Adramelech[1] ("the Satanists") seek a preliminary injunction ordering the Iowa Department of Administrative Services ("DAS") to permit them to hold an event in the Capitol Rotunda this December featuring a costume contest with participants dressed as Krampus, a grotesque, goat-like figure from European folklore storied for beating and kidnapping children. Contest participants would don full-body costumes complete with horns, masks, and even the rods traditionally used to strike children.

In 2024, the then-director of DAS denied the Satanists' application for that same requested event, explaining that the event would be harmful to children and was prohibited by DAS policy. The current DAS director, Mark Campbell, denied the Satanists' applications to hold the event in 2025 and 2026. The Satanists sued, alleging that DAS's denial violates their free speech, free exercise, and equal protection rights under the U.S. Constitution, along with state civil rights and religious freedom laws. The Satanists also moved for preliminary injunctive relief.

But the Satanists are unlikely to succeed on any of their claims. *First*, the Satanists' free speech claim fails because the Capitol Rotunda is a limited public forum and DAS's denial of the Satanists' proposed violence-themed event was both reasonable and viewpoint-neutral. *Second*, the Satanists' free exercise claim fails because the Satanists do not hold sincere religious beliefs and the event denials did not target the Satanists for their beliefs. *Third*, the Satanists forfeited their equal protection claim for purposes of the preliminary injunction motion and in any event do not point to any similarly situated events that DAS has treated differently. *Fourth*, the Satanists' state law claims may not be heard in federal court and in any event fail on the merits. Their Iowa Civil Rights Act claim fails because the Capitol Rotunda is not a public accommodation for purposes of event requests and DAS's denial was not based on the Satanists' religious views. And the Iowa Religious Freedom Restoration Act claim fails because the Satanists' exercise of religion is not substantially burdened. The other preliminary injunction factors also favor the State.

This Court should deny the Satanists' motion for a preliminary injunction.

---

[1] "Mortimer Adramelech" is a pseudonym. Dkt. 2 at 1.

## BACKGROUND

### I. Iowa's Department of Administrative Services Regulates Use of the Capitol.

Each year the Capitol building hosts visitors from around the world, including children. *See, e.g.*, *Capitol Tours & Resources*, Iowa Legislature, https://perma.cc/SV5Z-YHJQ; *Video and Pictorial Tours of the Capitol and Capitol Grounds*, Iowa Legislature, https://perma.cc/334Z-3EJG. But the rules for visiting the Capitol differ from the rules for hosting a formal event.

Because the Capitol is government-owned property, the State may limit what events are held there. The Legislature has given the DAS director authority to "establish, publish, and enforce rules regulating and restricting . . . use by the public." Iowa Code § 8A.322(3)(*a*). DAS regulations in turn govern public event requests. Organizers must apply to host an event at the Capitol. Iowa Admin. Code r. 11-100.4(4). The director then "may" permit events with "appropriate security and supervision" if the event is "consistent with the underlying purpose of these rules" and "the public interest so demands." *Id.* r. 11-100.4(4)(*b*). The director may also impose terms and conditions "consistent with the protection, health and safety of occupants of the buildings and visitors to the capitol complex." *Id.* r. 11-100.4(4)(*c*). The director "may refuse to allow use of the facilities that, in the director's judgment," are inconsistent with DAS regulations or "would be disruptive of official state business or of the public health, safety and welfare." *Id.* r. 11-100.4(5).

The DAS director approves an event through a letter or a memorandum of understanding ("MOU") signed by both DAS and the event sponsor that "specifies the conditions" for the event. Iowa Admin. Code r. 11-100.4(4)(*a*). In July 2024, DAS updated its policy to limit event requestors to one event per year. Events may not exceed one day. Dkt. 3-3 at 48. And the updated MOU notes that "the Capitol Complex is often a destination for children . . . learning about their State government" and prohibits "visual displays, sounds, and other actions that are harmful to minors, including, but not limited to," obscenity and gratuitous violence. Dkt. 3-3 at 50.

### II. DAS Denies the Satanists' 2024 Application to Hold a Krampus Costume Contest at the Capitol Rotunda.

The Satanic Temple's founders created it to engage in "poison pill activism": mimicking religion to file lawsuits demanding access to public spaces in hopes public religious expression

will become so distasteful that it leads to the secularization of the public square. Laurel Zwissler, *Religiously Nonreligious: The Secular Activism of The Satanic Temple*, 14 Religion & Society 168, 168–69 (2023). According to the complaint, the Satanic Temple is "non-theistic" and "venerates (but does not worship) the biblical adversary as a promethean icon against tyranny." Dkt. 9-1 ¶¶ 19, 22. The Satanists "take inspiration" from *Paradise Lost*, which they say portrays Satan "as a revolutionary antihero." *Id.* ¶ 22. Their "Seven Tenets" include compassion and empathy, justice, bodily inviolability, individual freedoms, science, human fallibility, and nobility. *Id.*

In 2023, the Satanists participated in a two-week holiday display at the Capitol in which religious and nonreligious groups set up various displays commemorating the holidays, including Christmas trees, nativity scenes, and menorahs. Dkt. 9-1 ¶¶ 37–38. The Satanists' display included a representation of Baphomet, an "occultic figure" who is "simultaneously male and female, human and beast, angel and demon." Dkt. 3-2 ¶¶ 6(a), 9.

The display generated controversy. One state legislator, for example, called for legislation banning Satanic displays in the Capitol. Dkt. 3-13 at 2. And an individual from Mississippi traveled to Iowa to vandalize the display, for which he was criminally prosecuted. Dkt. 9-1 ¶ 39; Dkt. 3-2 ¶ 11. But another state legislator, while finding the display personally objectionable, emphasized the First Amendment and ensuring the government does not "evaluat[e] and mak[e] determinations about religions." Dkt. 3-14 at 1. Governor Kim Reynolds took a similar approach, stating that "[i]n a free society, the best response to objectionable speech is more speech." Dkt. 3-12 at 1.

In July 2024, the Satanists applied to hold a four-day reading marathon of *Paradise Lost*. Dkt. 9-1 ¶ 40. Later that month DAS changed its MOU to permit event requestors a single one-day event per year. Dkt. 9-1 ¶ 42. Under the new policy, DAS sent the Satanists an MOU that would have permitted one day of the *Paradise Lost* event. Dkt. 9-1 ¶ 44.

The Satanists instead decided to withdraw the *Paradise Lost* application in favor of a holiday event. Dkt. 9-1 ¶¶ 45, 47. In October 2024, the Satanists applied to hold an event at the Capitol in December 2024. Dkt. 9-1 ¶¶ 47, 51. The application described the event as a "holiday

display" with "ritual, Krampus costumes, caroling, and other family-friendly activities such as coloring pages, and make and take ornaments." Dkt. 9-1 ¶ 52; Dkt. 3-3 at 41.

Krampus is a "half-goat, half-demon, horrific beast" who originated in European folklore as the antithesis of St. Nicholas—more commonly known as Santa Claus. Tanya Basu, *What Is Krampus? This Is the Real Story of the Christmas Beast*, Nat'l Geographic (Dec. 5, 2018), https://perma.cc/RA87-VTFY. Designed to terrify children into obedience, Krampus "bear[s] horns, dark hair, fangs, and a long tongue" and "comes with a chain and bells that he lashes about, along with a bundle of birch sticks meant to swat naughty children," whom he would "stuff . . . in a sack, and take . . . away to his lair." *Id.*; *see also* Sophie-Claire Hoeller, *The Story Behind 'Krampus,' Santa's Demonic Helper Who Exists to Scare Children into Being Good*, Business Insider (Dec. 5, 2015), https://perma.cc/9ELC-ADSK (Krampus transports kids to "hell (or the nearest river)"). In Europe, "drunken men dressed as devils" chase people through the streets in a "Krampus run." *Basu*, *supra*.

Krampus events have turned violent, with performers pulling spectators from crowds to strike them with rods and participants on both sides suffering injuries. *E.g.*, Philip Oltermann, *Austria Struggles with Marauding Krampus Demons Gone Rogue*, The Guardian (Dec. 8, 2019), https://perma.cc/B552-XUZW; Johanna Urbancik, *Krampus Parades Turn Violent: Traditional Festivities Spark Debate Over Safety and Gendered Violence*, Euronews (Dec. 3, 2024), https://tinyurl.com/5dju3uht; Johannes Pleschberger, *Austria's Krampus Parades Too Violent for Insurance Companies,* CGTN (Dec. 15, 2022), https://perma.cc/WGA6-JQDR. Krampus events also cause chaos in the United States. Brittany Lyte, *Kaua'i Christmas Parade Float Sparks Uproar Over 'Demonic' Theme*, Honolulu Civ. Beat (Dec. 15, 2025), https://perma.cc/VS94-5RX4.

Later in October 2024, the Satanists completed an MOU for their requested holiday event. Dkt. 9-1 ¶ 55. In early December 2024, DAS requested more information, including details about the costumes. Dkt. 9-1 ¶ 57. The Satanists responded a few days later, explaining that the event would include a Krampus costume contest. Dkt. 3-3 at 35. The Satanists also sent images of the

anticipated costumes, which show individuals dressed in full-body, horned costumes with grotesque masks covering their faces, bells around their waists, and the rods traditionally used to beat children. Dkt. 3-2 ¶ 23(c); Dkt. 3-3 at 34–35, 69–70.

The DAS director denied the Satanists' application because the proposed event violated the MOU's prohibition on displays, sounds, and other conduct harmful to minors. Dkt. 9-1 ¶ 62; Dkt. 3-3 at 92. The Satanists requested further explanation, and the DAS director responded that "[t]he cumulative circumstances that occur within the State Capitol building, including the presence of minors, coupled with the anticipation of costumes with sticks used as weapons on children, positions the event to be harmful to minors contrary to MOU section 5.15." Dkt. 9-1 ¶¶ 64–66. The Satanists proposed resubmitting their application and omitting the costume contest, but by then the deadline for applying for a December event had passed. Dkt. 9-1 ¶¶ 71–75.

## III. DAS Denies the Satanists' 2025 Application for the Krampus Costume Contest.

In June 2025, the Satanists filed civil rights complaints for the 2024 denial with the Iowa Office of Civil Rights (OCR) against DAS, DAS's director, and Governor Reynolds. Dkt. 9-1 ¶ 78.

In September, the Satanists applied to hold an event in December 2025, including the same Krampus costume-contest event DAS denied in 2024. Dkt. 9-1 ¶¶ 81, 83; Dkt. 3-5 at 11. Shortly afterward, Mark Campbell became the new DAS director. Dkt. 9-1 ¶ 82.

When DAS asked for more information about the event after receiving the Satanists' MOU, the Satanists again submitted images of the same costumes that prompted the 2024 denial. Dkt. 9-1 ¶¶ 84–87; Dkt. 3-5 at 30, 33–37. So in November 2025, DAS denied the application and directed the Satanists to contact Director Campbell with any questions. Dkt. 9-1 ¶ 88. The Satanists do not allege that they asked Director Campbell for an explanation or proposed any modifications.

The same day, the Iowa Office of Civil Rights issued a Tier 1 Investigative Report that determined the 2024 denial warranted further investigation. Dkt. 3-3 at 234. The Satanists say this report constituted a probable-cause finding, but that is inaccurate. Dkt. 11-1 at 15. A further-investigation determination at the Tier 1 stage means that the submitted information suggests a "reasonable possibility" of probable cause or that "the legal issues in the complaint need

development." Iowa Admin. Code r. 161-3.26(5). Among OCR's November 24, 2025, findings were that DAS gave a "legitimate, nondiscriminatory reason" for denying the Satanists' application, that the Satanists had not identified any similarly situated events that DAS had permitted, and that post-denial campaign comments by Adam Steen, the DAS director at the time of the 2024 denial, did not conclusively establish a discriminatory motive. Dkt. 3-3 at 229–31.

**IV. The Satanists Sue to Hold the Krampus Costume Contest in December 2026.**

In March 2026, the Satanists filed yet another application for the exact same event, this time for December 12, 2026. Dkt. 9-1 ¶ 94; Dkt. 3-7 at 13. Over the next two months, the Satanists filed complaints with OCR based on the 2025 denial and their 2026 application, though at the time DAS had not yet issued a decision on the 2026 event. Dkt. 9-1 ¶¶ 92, 98. Rather than let the administrative process proceed to its conclusion, the Satanists requested right-to-sue letters from OCR for their 2024 and 2025 complaints, which OCR issued in July 2026. Dkt. 9-1 ¶¶ 80, 93; *e.g.*, Dkt. 3-3 at 206, 210. The right-to-sue letters do not constitute a finding on the merits; instead, they issue on request once sixty days have passed since filing the complaint. Dkt. 3-3 at 206, 210; Iowa Code § 216.16(2)–(3); Iowa Admin. Code r. 161-3.43.

Later in July 2026, DAS provided the Satanists an MOU, which they completed and signed. Dkt. 9-1 ¶¶ 100, 105. The Satanists then requested a right-to-sue letter for the 2026 application. Dkt. 9-1 ¶ 104. The Satanists sued and moved for a preliminary injunction requiring DAS to permit the 2026 event. Dkts. 1, 3. DAS denied the 2026 application on September 11. Dkt. 25-1 at 2.

## LEGAL STANDARD

The Satanists must show they are likely to prevail on the merits, not merely a fair chance. The Eighth Circuit requires that more rigorous showing when a movant seeks to enjoin enforcement of a state statute, *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc), because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference." *Id.* at 732 (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir.

1995)). And the court signaled the same logic reaches agency action taken under a statutory and regulatory scheme. *Id.* at 732 n.6.

That heightened standard fits here because DAS acted "pursuant to a statutory or regulatory scheme." *Able*, 44 F.3d at 131; *see* Iowa Code § 8A.322(3); Iowa Admin. Code r. 11-100.4(4)(*b*). But the Satanists' claims fail under either standard.

In deciding whether to grant a preliminary injunction, the Court weighs "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). Likelihood of success is "the most significant" of these factors. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).

## ARGUMENT

### I. The Satanists Are Not Likely To Succeed On The Merits.

#### A. The Satanists are not likely to succeed on their free speech claim.[2]

The State "need not permit all forms of speech on property that it owns and controls." *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 333 (8th Cir. 2011) (quotation omitted); *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). Using government property is a privilege, not a right. *Lubavitch of Iowa, Inc. v. Walters*, 873 F.2d 1161, 1163 (8th Cir. 1989). The State, "no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated." *Powell v. Noble*, 798 F.3d 690, 699 (8th Cir. 2015) (quotation omitted).

So the State may restrict use of its property "as long as it does so without discriminating in favor of one group over another." *Lubavitch*, 873 F.2d at 1163. Traditional and designated public forums "receive the greatest protection." *Powell*, 798 F.3d at 699. But the State has "more flexibility to regulate speech in limited public forums." *Id.* For a limited public forum, the standard

[2] The Satanists lack standing for injunctive relief against Mr. Steen because an injunction against a former director redresses nothing. *Murthy v. Missouri*, 603 U.S. 43, 61, 69 (2024). And sovereign immunity bars claims against DAS. *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007).

is "whether restrictions on speech are reasonable and viewpoint-neutral." *Id.* at 700; *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998).

***1. The Iowa State Capitol building is a limited public forum.***

The quintessential traditional public forums are streets and parks. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). In contrast, "[d]esignated public forums are public areas which the State has opened for use by the public as a place for expressive activity." *Powell*, 798 F.3d at 699 (quotation omitted). And a limited public forum "arises where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Viewpoint Neutrality Now! v. Bd. of Regents of Univ. of Minn.*, 109 F.4th 1033, 1039 (8th Cir. 2024) (quotation omitted).

To determine forum, courts consider a venue's characteristics, typical use, function and purpose, the government's intent and policy, and special characteristics. *Sessler v. City of Davenport*, 102 F.4th 876, 882 (8th Cir. 2024). Courts evaluate those factors in context of "the access sought by the speaker." *Cornelius*, 473 U.S. at 801. A location is not a designated public forum because "expressive activity occurs" there, *Victory Through Jesus*, 640 F.3d at 334 (cleaned up), nor because "members of the public are permitted to come and go at will." *Powell*, 798 F.3d at 699 (quotation omitted). And the State does not create a designated public forum when speakers must, "as individuals, obtain permission." *Forbes*, 523 U.S. at 679 (quotation omitted).

For purposes of holding an event at the Capitol—the access sought by the Satanists here—Iowa's Capitol building, including the Rotunda, is a limited public forum. The Capitol building serves as Iowa's seat of government. The Capitol is "reserved for the operations of the general assembly and the governor, and, for ceremonial purposes, for the courts." Iowa Code § 8A.322(2). Due to its unique artistic and historic value, the Capitol receives many visitors, including children, from around the state of Iowa, the United States, and the world. *E.g.*, *Capitol Tours, supra.*

But Iowa does not allow unrestricted access to the Capitol. The Iowa Legislature has directed the DAS director to regulate the public's use of the Capitol and its grounds. Iowa Code § 8A.322(3)(*a*). Visitors to the Capitol must go through security. *See* Iowa Admin. Code r. 11-

100.2(3)(*a*). Members of the public may not bring dangerous weapons to the Capitol. *Id.* r. 11-100.2(1). And they may visit only during normal office hours. *Id.* r. 11-100.4(11).

DAS regulations place further guardrails on the public's ability to hold events at the Capitol, including the Rotunda. As explained, each event requires the DAS director's permission. The DAS director "may"—but is not required to—allow events that are adequately secured and supervised if the event is "consistent with the underlying purpose of [DAS's] rules" and "the public interest so demands." Iowa Admin. Code r. 11-100.4(4)(*b*). The DAS director may impose conditions to protect both occupants and visitors. *Id.* r. 11-100.4(4)(*c*). And the director "may refuse to allow use of the facilities that, in the director's judgment, would be disruptive of official state business or of the public health, safety and welfare" or violate DAS regulations. *Id.* r. 11-100.4(5). Pursuant to these parameters, the Capitol Rotunda is used by groups for activities such as displays or information tables. Campbell Dec. ¶¶ 7–8.

The Satanists assert (Dkt. 11-1 at 8) that the Capitol is a designated public forum because it "is open to all without regard to the subject matter of the event." As explained above, that assertion is inaccurate. The Capitol is open only to permitted events that are not harmful to children and otherwise satisfy DAS rules. And capitol buildings are not automatically traditional or designated public forums. *United States v. Nassif*, 97 F.4th 968, 977 (D.C. Cir. 2024) (U.S. Capitol). To the contrary, simply entering the Capitol is "a familiar signal that the building's interior" is "uniquely nonpublic." *Id.* at 975 (quotation omitted).

The Satanists cite (Dkt. 11-1 at 8) two cases referencing the Capitol Complex and grounds as either a traditional or designated public forum. But courts evaluate the forum in light of "the access sought by the speaker." *Cornelius*, 473 U.S. at 801. And neither of the Satanists' cases addressed an event held inside the Capitol building, much less a violence-themed costume contest in the Rotunda. *See Johnson v. Bayens*, 2020 WL 12618873, at *1, 6 (S.D. Iowa Dec. 10, 2020) (ban on certain individuals from the Capitol and Capitol grounds); *Lubavitch of Iowa, Inc. v. Walters*, 684 F. Supp. 610, 611, 613 (S.D. Iowa 1988), *aff'd*, 873 F.2d 1161 (8th Cir. 1989) (menorah on Capitol grounds). And both were decided before DAS's 2024 policy change.

### 2. *DAS's denial of the Satanists' event was reasonable and viewpoint-neutral.*

The government may place "reasonable and viewpoint neutral" restrictions on limited public forums. *Satanic Temple v. City of Belle Plaine*, 80 F.4th 864, 868 (8th Cir. 2023). DAS's denial of the Satanists' requested event satisfies both requirements.

***Reasonableness.*** Reasonableness is assessed "in light of the purpose which the forum at issue serves." *Victory Through Jesus*, 640 F.3d at 335 (quotation omitted). "[A] restriction need not be the most reasonable or the only reasonable limitation." *Id.* (quotation omitted); *accord Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 692 (2010). Restrictions may be based, for example, on the speech's subject matter or manageability or resource concerns. *Powell*, 798 F.3d at 701 (quotation omitted).

DAS's denial was reasonable. "[P]rotecting the safety and convenience of persons using a public forum is a valid governmental objective." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981) (quotation omitted). So is "limit[ing] . . . disruption" and "facilitat[ing] safe and efficient access" to public property. *Powell*, 798 F.3d at 701. More, the State has a strong interest in protecting children. *Ginsberg v. New York*, 390 U.S. 629, 639–40 (1968).

The Capitol building, including the Rotunda, is designed to facilitate the business of Iowa's government and provide a safe, beautiful, and family-friendly space for the Capitol's many visitors, including children, to learn about Iowa's history and government. Permitting a costume contest with entrants in full-body, masked costumes representing a grotesque figure designed to scare children, all while carrying sticks traditionally used to beat children, clearly runs counter to those purposes. That is especially true in the Rotunda, a central location where space is limited and visitors cannot avoid seeing participants in costume.

The Satanists' requested event also carries multiple security risks. Krampus-themed events often turn violent and cause disruption. *E.g.*, Urbancik, *supra*. The Satanists have not shown any means of controlling costume design and have proposed no safeguards to prevent the contest from getting out of hand. Permitting sticks traditionally used to beat children is also in tension with DAS's rule against dangerous weapons. Iowa Admin. Code r. 11-100.2(1); *id.* r. 11-100.1. The

costumes' masks hide participants' faces and identities, which adds to the security risk. Dkt. 3-2 ¶ 23(c). And the Satanists' proclivity for pseudonyms compounds those concerns. Dkt. 3-3 at 30 (2024 application listing "Mortimer Adramelech" as the on-site contact person); Dkt. 3-5 at 14–21 (2025 application and MOU); Dkt. 3-7 at 13, Dkt. 3-11 at 4 (2026 application and MOU).

DAS's decision to deny permission for the Satanists' requested event is well-supported by Eighth Circuit caselaw. For example, the Eighth Circuit upheld a prohibition on signs on poles and sticks at the Iowa State Fair based on the State's "valid interest in protecting [Fair] safety." *Powell*, 798 F.3d at 701–02. The Eighth Circuit has also upheld other restrictions based on safety and the forum's purpose. *See Ball v. City of Lincoln*, 870 F.3d 722, 737 (8th Cir. 2017) (restrictions on leafletting at arena that "would be disruptive of the normal activities within the Plaza Area"); *Victory Through Jesus*, 640 F.3d at 335 (limits on school backpack flyer distributions designed "to reduce the volume to manageable levels and to respond to parent complaints").

And adopting the Satanists' position "would result in less speech, not more" because forcing the State to choose between "cacophony, on the one hand, and First Amendment liability" could result in stricter limits on the types of events held at the Capitol—precisely the result the Satanists seek. *Forbes*, 523 U.S. at 680–81; *see* Zwissler, *supra*, at 168.

***Viewpoint Neutrality.*** The denial of the Satanists' event is viewpoint-neutral. Policies are viewpoint-neutral where they are facially neutral and applied neutrally. *Lubavitch*, 873 F.2d at 1163. Viewpoint discrimination, in contrast, occurs where the government "has targeted particular views," "not merely the subject matter" of the restricted speech. *Viewpoint Neutrality Now!*, 109 F.4th at 1040 (quotation omitted). But a "forum limitation is not viewpoint discriminatory simply because it has an incidental effect on a certain subset of views." *Id.* at 1041 (quotation omitted).

DAS's events policy is facially viewpoint-neutral, and the Satanists do not argue otherwise. Instead, the Satanists contend that DAS has applied the policy in a viewpoint-discriminatory manner by "singl[ing] out Plaintiffs for exclusion." Dkt. 11-1 at 11. But DAS has denied multiple event applications under the new rules, including applications from religious groups. Dkt. 3-3 at 40. No viewpoint discrimination occurs when the government applies a facially neutral policy

equally. *Satanic Temple*, 80 F.4th at 868 (no viewpoint discrimination where city "closed the limited public forum to everyone, not just speakers with certain views").

Nor do the Satanists point to any comparable, violence-themed events that DAS has approved despite presenting similar risks to children and public safety. And no viewpoint discrimination exists even where the plaintiff is the only individual enforced against because he is the only person to violate the relevant policy. *Ball*, 870 F.3d at 736–37. The Satanists admit that DAS permitted their 2023 display and was in the process of approving the *Paradise Lost* event when the Satanists withdrew that application in favor of holding a holiday event. Dkt. 9-1 ¶¶ 37–47. And they do not show that any other group has been granted a costume contest in the Rotunda, much less one for a character known for violence toward children, or that costumed figures have been approved by DAS to accompany displays in the Capitol building. Campbell Dec. ¶¶ 9–10.

DAS's decision is thus aimed at the Satanists' conduct, not their viewpoint. *CLS,* 561 U.S. at 696. The Satanists claim (Dkt. 11-1 at 12–13) that the denial constitutes viewpoint discrimination because the MOU's list of prohibited items does not include sticks and because DAS "wrongfully assumed that anyone wearing a Krampus costume would inevitably beat children." But those contentions fail. The MOU does not provide an exhaustive list of prohibited items; DAS regulations additionally prohibit bringing dangerous weapons in the Capitol. Iowa Admin. Code rs. 11-100.1, 11-100.2(1). Nor is the DAS director's discretion so constrained that he must permit all items not expressly prohibited in the MOU. The DAS director retains discretion to prohibit items that are not on the enumerated list but nonetheless pose a risk to visitors or State employees. *See Powell*, 798 F.3d at 698 (upholding "unwritten, informal rules" against bringing sticks and poles to the Iowa State Fair against a First Amendment challenge).

The Satanists' other argument—that DAS's 2024 denial assumed that participants planned to beat children—mischaracterizes DAS's position. DAS never stated that its decision rested on the assumption that the Satanists planned to use the sticks to beat children. *See* Dkt. 3-3 at 96 (describing the sticks as *historically* "used" as weapons on children). The planned use of sticks to beat children would, of course, be enough to deny the event. But the DAS director concluded that

the presence of participants in full-body, masked costumes depicting a figure designed to evoke horror and storied for beating and kidnapping children, complete with the sticks traditionally used to beat children, would be distressing for children and, in turn, is not conducive to the safe, family-friendly environment the Capitol building seeks to create. In any event, it is common sense that DAS can prohibit bringing weapons into the Capitol despite promises not to use them.

The Satanists also say (Dkt. 11-1 at 12) that section 5.15 of the MOU provided no basis to deny the event because the costume contest did not involve obscenity or gratuitous violence or gore. But the policy directs the DAS director to deny events that are "harmful to minors" for reasons "including, but not limited to" obscenity or gratuitous violence or gore, which serve as examples—not an exhaustive list—of prohibited material. Dkt. 3-3 at 50. And DAS reasonably concluded that a contest celebrating a figure known for beating and abducting children, rods in hand, would be harmful to the children who visit the Rotunda each December.

Nor does the 2024 policy change establish viewpoint discrimination. Nothing about amending access policies is "surprising nor sinister, even if prompted in part by" the Satanists' requested event. *Victory Through Jesus*, 640 F.3d at 335. DAS need not maintain the same access to government property in perpetuity. *Satanic Temple*, 80 F.4th at 868; *Perry*, 460 U.S. at 46.

The Satanists ultimately rely on pretext, arguing that DAS took longer to respond to its applications and that the former DAS director personally reviewed the 2024 application. Dkt. 11-1 at 13–14. But the Satanists point to no relevant comparator. And there is nothing discriminatory about the fact that the Satanists' proposed event—a costume contest in the Rotunda for a character storied for violence toward children—required careful review. More, the Satanists' cited cases do not apply. *See Robb v. Hungerbeeler*, 370 F.3d 735, 740, 743–44 (8th Cir. 2004) (overbroad policy served no reasonable purpose and record did not establish violation); *Satanic Temple, Inc. v. Saucon Valley Sch. Dist.*, 671 F. Supp. 3d 555, 571 (E.D. Pa. 2023) (school district unequally applied policy, failed to establish violation, and rescinded approval after backlash).

That leaves campaign comments made by former DAS director Steen in his personal capacity after he left DAS. Dkt. 11-1 at 14. The Satanists consider Mr. Steen's after-the-fact

campaign rhetoric the "starkest evidence" for viewpoint discrimination. *Id.* But Mr. Steen is no longer the DAS director. His comments are not relevant to this motion, which concerns whether the current decisionmaker, Director Campbell, must grant the Satanists' 2026 application. And the Satanists provide no evidence suggesting that Director Campbell acted pretextually.

Even if Mr. Steen's later campaign remarks bore on the 2026 decision (they do not), those remarks do not show that DAS denied the event because of the Satanists' views. The question is whether the stated reason is "in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811. It is not. DAS allowed the Satanists' 2023 display and was in the process of approving a one-day *Paradise Lost* reading before the Satanists withdrew it. Dkt. 9-1 ¶¶ 37–47. DAS has denied other groups, including religious groups, under the same set of rules. Dkt. 3-3 at 40. And a remark that certain material "could have been harmful for children to see" (Dkt. 11-1 at 14) restates the viewpoint-neutral ground rather than revealing hostility toward the Satanists.

#### ***3. Even if the Rotunda is a traditional or designated public forum, DAS's denial of the Satanists' event satisfies strict scrutiny.***

DAS's denial of the Satanists' event satisfies strict scrutiny. Protecting children is a compelling interest. *E.g.*, *Ginsberg*, 390 U.S. at 639–40; *Brandt ex rel. Brandt v. Griffin*, 147 F.4th 867, 882 (8th Cir. 2025) (en banc). So are public safety and crime prevention. *Schall v. Martin*, 467 U.S. 253, 264 (1984). And DAS's denial satisfies narrow tailoring because no modification of a Krampus costume contest held in the Rotunda satisfies the State's interests. After the 2025 denial, the Satanists do not allege that they asked for an explanation or proposed modifications. And though in 2024 the Satanists proposed resubmitting their application to omit the costume contest, that proposal came after the application deadline. Dkt. 3-3 at 97.

The Satanists' strict scrutiny analysis merely recycles their contention that DAS targeted them based on viewpoint, citing "contemporary statements of the decision maker and legislators." Dkt. 11-1 at 18. But again, the Satanists cite no evidence, much less "contemporary statements," suggesting pretext by Director Campbell, the relevant decisionmaker for 2025 and 2026. The

contemporaneous comments from legislators are from the 2023 event, when DAS permitted the Satanists' display. Dkt. 9-1 ¶¶ 114–15. No evidence establishes pretext. *Supra* at I.A.2.

The Satanists otherwise rely on *Niemotko v. Maryland*, 340 U.S. 268 (1951). Dkt. 11-1 at 18. But in that case there was "no ordinance or statute regulating or prohibiting the use of the park" at issue and no "valid basis for the refusal" of that event. 340 U.S. at 271–72. In contrast, here Iowa statutes and DAS regulations and policy govern the DAS director's authority. And plentiful evidence shows DAS's denial was based on valid, viewpoint-neutral reasons.

**B. The Satanists are not likely to succeed on their free exercise claim.**

The Satanists have not established that their views are religious or sincerely held. "Purely secular views or personal preferences will not support a Free Exercise Clause claim." *Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996). And parodies intended to advance political arguments are not religions, even if "designed to look very much like a religion." *Cavanaugh v. Bartelt*, 178 F. Supp. 3d 819, 824, 829 (D. Neb. 2016), *aff'd*, No. 16-2105 (8th Cir. Sept. 7, 2016).

The Satanic Temple's goals are political, not religious. The Satanic Temple was founded in reaction to President Bush's Office of Faith-Based and Community Initiatives, and its strategy is to "claim[] standing as a religion" to demand access to public property to make religious access unpalatable. Zwissler, *supra*, at 168–69. So, for the Satanic Temple, a person's "spiritual beliefs are irrelevant." *Id.* at 170. And the Satanic Temple has described itself inconsistently as both "an association of politically aware Satanists, secularists and advocates for individual liberty" and as a religion. Dkt. 18 at 6–7. Nor do the Satanists explain how Krampus has any connection with their beliefs. *See* Dkt. 3-2 ¶¶ 4–6; Dkt. 9-1 ¶¶ 22, 134.

In any event, even if the Satanists' beliefs are religious and sincere, the Free Exercise Clause "does not relieve an individual" from "valid and neutral law[s] of general applicability." *B.W.C. v. Williams*, 990 F.3d 614, 620 (8th Cir. 2021) (quotation omitted). Nor does it entitle litigants to control use of government property. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 453 (1988). Instead, for the Satanists to establish a free exercise claim DAS must have "targeted the Satanic Temple's religious conduct." *Satanic Temple*, 80 F.4th at 868. DAS did not.

***Neutrality.*** Courts determine whether a policy is neutral by evaluating its object. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). That analysis begins with its text. *Id.* Here, nothing in the relevant statutes, regulations, or policy, nor in DAS's denial of the event request, refers to religion or religious practice. So DAS's decision is facially neutral.

The Satanists can therefore only succeed if the policy or its application was a "religious gerrymander[]." *Lukumi*, 508 U.S. at 534 (quotation omitted). For this analysis, courts evaluate "the effect of a law in its real operation," such as whether the "only conduct" prohibited is the plaintiff's religious conduct. *Id.* at 535. In *Lukumi*, for example, the ordinance had been carefully crafted such that "few if any killings of animals [were] prohibited other than Santeria sacrifice" and "killings that are no more necessary or humane in almost all other circumstances [were] unpunished." *Id.* at 536. But DAS's harmful-to-minors policy does not include exceptions. Nor do the Satanists point to any comparable event DAS has permitted.

The Satanists contend (Dkt. 11-1 at 17) that DAS's denial targets their religious conduct because of "a general public disapproval of Plaintiffs' religious viewpoint" that "is shared by the IDAS's decisionmakers." But otherwise-lawful government action is not unconstitutional simply because the general public or public officials hold different views than the plaintiff; what matters is whether the government's action discriminated based on viewpoint. *Cornelius*, 473 U.S. at 811. And to the extent subjective motive matters, it is the decisionmaker's motive—not public opinion or other officials' opinions—that counts. *Satanic Temple*, 80 F.4th at 867 (upholding policy change despite objections to Satanic display in city park); *cf. Satanic Temple, Inc. v. City of Scottsdale*, 856 F. App'x 724, 726 (9th Cir. 2021) (upholding city manager's decision not to permit Satanic Temple's invocation at city council meeting despite comments from councilmembers). And the relevant decisionmaker is Director Campbell, not private-citizen Steen. The Satanists have not pointed to any evidence suggesting an improper motive by Director Campbell.

***General Applicability.*** DAS's policy is also generally applicable. It does not "provid[e] a mechanism for individualized exemptions" or "permit[] secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522,

533–34 (2021) (quotation omitted). Requestors may not hold events harmful to minors, full stop. Nor do the Satanists point to any instance where DAS has granted an exemption to the harmful-to-minors requirement. DAS's rules are "applied equally." *Satanic Temple*, 80 F.4th at 868.

The Satanists' reliance (Dkt. 11-1 at 17) on *Cantwell v. Connecticut*, 310 U.S. 296 (1940), fares no better. The licensing official there had unfettered discretion to decide what counted as a religious cause. *Id.* at 305. Here, statute, regulation, and written policy confine the director's judgment to identified criteria: security, the Capitol's purpose, the public interest, and whether an event is harmful to minors.

**C. The Satanists forfeited their equal protection claim and are unlikely to succeed on the merits regardless.**

The Satanists' motion does not raise equal protection, so any equal-protection argument is forfeited for purposes of preliminary injunctive relief. But even had the Satanists raised it, that claim would fail. Equal protection "requires the government to treat similarly situated people alike." *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 959 (8th Cir. 2019) (quotation omitted). But the Satanists point to no evidence "that [they were] singled out and treated differently than similarly situated entities for a prohibited purpose or motive, such as religious discrimination." *Satanic Temple*, 80 F.4th at 869. Nor does a mere "conclusory allegation" that the government's motive was to inflict harm on a particular group suffice. *Satanic Temple v. City of Belle Plaine*, 475 F. Supp. 3d 950, 963 (D. Minn. 2020), *aff'd*, 80 F.4th 864 (8th Cir. 2023). DAS's rules apply equally, so the Satanists cannot succeed on an equal-protection claim.

**D. The Satanists are not likely to succeed on their state law claims.**

The Satanists' state-law claims cannot support a preliminary injunction at all. A federal court may not order state officials to conform their conduct to state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *see also Smith v. Reynolds*, 139 F.4th 631, 637 (8th Cir. 2025). As the Supreme Court explained, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. That bar applies whether the relief sought is prospective or

retrospective, *id.*, and it reaches DAS and Director Campbell in his official capacity alike. The Iowa Civil Rights Act and the Iowa Religious Freedom Restoration Act claims therefore provide no basis for the injunction the Satanists seek. And those claims fail on the merits in any event.

***1. The Satanists' Iowa Civil Rights Act claim fails.***

Even if the Satanists could sue in federal court under the Iowa Civil Rights Act, that claim fails. The Satanists must establish (1) they are religious; (2) they were denied "accommodations, advantages, facilities, services, or privileges" by a "public accommodation"; and (3) the denial was because of their religion. Iowa Code § 216.7(1)(*a*). The Satanists' claim falters at each step.

*First*, the Satanists are not religious, so they are not in a protected class. *Supra* at I.B.

*Second*, DAS does not open the Capitol to all comers for all events. Each event requires the director's approval under published criteria. *E.g.*, Iowa Admin. Code r. 11-100.4(4)–(5). So the Satanists' claim does not satisfy the public-accommodation element.

*Third*, the Satanists do not establish that DAS's denial of their event request was because of their beliefs. *Supra* at I.A.2. DAS established a legitimate, nondiscriminatory reason for denying the Satanists' event request—the risk to children and safety presented by a Krampus costume contest. And the Satanists do not show that reason was pretextual. The Satanists "present[] no evidence there were similarly situated [groups] outside [their] protected class who were treated differently." *Kiray v. Hy-Vee, Inc.*, 716 N.W.2d 193, 204 (Iowa Ct. App. 2006). Nor did DAS provide them use of the facility in a "markedly hostile" manner. *Id*. at 205.[3]

***2. The Satanists' Religious Freedom Restoration Act claim fails.***

Even if the Satanists could raise the Iowa Religious Freedom Restoration Act in federal court, that claim also fails. Under that law, "[s]tate action shall not substantially burden a person's exercise of religion" unless the government's action satisfies strict scrutiny. Iowa Code § 675.4(1). Religious exercise is "the practice or observance of religion," including "the ability to act or refuse to act in a manner substantially motivated by one's sincerely held religious belief." *Id.* § 675.3(2).

[3] The Satanists do not raise retaliation in their preliminary injunction briefing and thus also forfeited that issue with respect to preliminary injunctive relief. *See* Dkt. 11-1 at 19–21.

A substantial burden is "any action that directly or indirectly constrains, inhibits, curtails, or denies the exercise of religion" or "compels any action contrary to a person's exercise of religion," such as through "withholding of benefits; assessment of criminal, civil, or administrative penalties; or exclusion from governmental programs or access to governmental facilities." *Id.* § 675.3(5).

The Satanists do not qualify as a religion or identify a sincerely held religious belief that requires access to the Capitol for a Krampus costume contest, so they cannot meet that threshold requirement. *Supra* at I.B. But even if the Satanists are religious, DAS's denial of their event request does not substantially burden their religious exercise. *Satanic Temple*, 80 F.4th at 869. "A substantial burden exists when the Government forces a person to act, or refrain from acting" through "sanctions, punishment, or denial of an important benefit as a consequence for noncompliance." *New Doe Child #1 v. United States*, 901 F.3d 1015, 1026 (8th Cir. 2018). In other words, a "substantial burden" is "coercive or compulsory." *Satanic Temple, Inc. v. City of Boston*, 111 F.4th 156, 180 (1st Cir. 2024) (quotation omitted). In contrast, "mere inconvenience" does not "rise to the level of a substantial burden." *New Doe Child #1*, 901 F.3d at 1027 (quotation omitted).

Simply denying use of the Capitol Rotunda does not substantially burden religious exercise. The Satanists are "still free to practice [their] religion in places other than" the Rotunda. *Brown v. Ark. Dep't of Fin. & Admin.*, 180 F. Supp. 3d 602, 617 (W.D. Ark. 2016), *aff'd*, 674 F. App'x 599 (8th Cir. 2017). Nothing prohibits the Satanists from holding a Krampus costume contest elsewhere, as they did last year. Dkt. 11-1 at 21. And nothing stops them from engaging with the public through other means. *E.g.*, *Brown*, 180 F. Supp. 3d at 617 ("reject[ing] the notion that being banned from collecting signatures for a ballot initiative in certain locations in Arkansas would somehow impinge on [plaintiff's] sincerely held religious beliefs or his ability to practice his religion"). In any event, DAS's denial satisfies strict scrutiny. *Supra* at I.A.3.

## II. The Other Factors Weigh Against the Satanists' Requested Relief.

Because the Satanists are not likely to succeed on the merits, the Court need not proceed to the other preliminary-injunction factors. *See Rounds*, 530 F.3d at 732. But those factors also weigh against an injunction. Because the Satanists' claims are unlikely to succeed, they cannot

show the irreparable injury that attends a likely constitutional violation, and in any event they remain free to hold the same event elsewhere, as they did last year. States have strong interests in protecting children and determining how government property is used. *E.g.*, *Ginsberg*, 390 U.S. at 639–40; *Powell*, 798 F.3d at 699. Requiring DAS to permit a Krampus costume-contest event in the Capitol Rotunda irreparably jeopardizes those important interests.

When the government is the opposing party, the balance of harms and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And any time a State is enjoined from carrying out its own lawful policies, "it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation omitted); *see Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020).

## III. The Satanists Must Post an Injunction Bond Before Any Injunction Takes Effect.

A "court may issue a preliminary injunction . . . only if the movant gives security." Fed. R. Civ. P. 65(c). Rule 65(c) uses mandatory language. Indeed, when the Federal Rules leave the decision whether to require a bond to the court's discretion, they expressly say so. *See, e.g.*, Fed. R. App. P. 41(d)(3). The Eighth Circuit has suggested courts may waive the bond, but that case relies on the "important public interest in the enforcement of NEPA." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016). And it cannot be reconciled with earlier panel rulings. *See Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991) ("we will reverse its order if it . . . fails to require an adequate bond.").

Permitting the Satanists to use the Capitol Rotunda for their proposed event presents risks to children, public safety, and government property. If this Court grants a preliminary injunction, the Court should impose a bond commensurate with the costs of security, liability insurance, and a $10,000 damage deposit. Iowa Admin. Code r. 11-100.4(6); Dkt. 3-11 at 1–3.

## CONCLUSION

For these reasons, the Court should deny the motion for a preliminary injunction.

September 21, 2026

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

LINDSEY BROWNING
*Assistant Attorney General,*
*Agency Counsel Division*

PATRICK C. VALENCIA
*Deputy Solicitor General*

*/s/ Catherine Frappier*
CATHERINE FRAPPIER
*Assistant Solicitor General*

Iowa Department of Justice
Hoover State Office Building
Des Moines, Iowa 50319
(515) 281-5164 / (515) 281-5132
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
lindsey.browning@ag.iowa.gov
patrick.valencia@ag.iowa.gov
catherine.frappier@ag.iowa.gov

ATTORNEYS FOR DEFENDANTS

*Original filed electronically.*
*Copy electronically served on all parties of record.*