IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| THE SATANIC TEMPLE, INC., and MORTIMER ADRAMELECH,<br><br>Plaintiffs,<br><br>v.<br><br>MARK CAMPBELL, in his Individual Capacity and Official Capacity as the Director of the Iowa Department of Administrative Services, ADAM STEEN, in his Individual Capacity, and IOWA DEPARTMENT OF ADMINISTRATIVE SERVICES,<br><br>Defendants. | ) | Case No. 4:26-cv-00336-SMR-HCA<br><br>ORDER ON MOTION FOR PRELIMINARY INJUNCTION |

For three consecutive years, The Satanic Temple submitted an application to hold a one-day holiday event in the Rotunda of the Iowa State Capitol. For three consecutive years, the Iowa Department of Administrative Services (the "Department") denied the request. In this litigation, the Department defends those denials on the ground that the event's costume contest—featuring Krampus, a figure from European folklore—would harm children. Plaintiffs The Satanic Temple, Inc., and Mortimer Adramelech[1] (collectively, "TST") move for a preliminary injunction directing the Department to approve their application for an event on December 12, 2026. [ECF No. 3]. The Court held an evidentiary hearing on October 6, 2026, at which four witnesses testified.

[1] Adramelech has moved to proceed under a pseudonym. [ECF No. 2]. That motion remains pending, and the Court defers ruling on it. The Court refers to him by his pseudonym in this Order without deciding the motion.

Because TST has shown a likelihood of success on its free speech claim and the remaining factors favor relief, the motion is GRANTED.

## I. BACKGROUND

### *A. The Department's Event Process*

The Department reviews applications to hold events at the Capitol. Iowa Admin. Code r. 11-100.4. Under the Department's rules, the Director "may" permit an event if it is "consistent with the underlying purpose" of those rules and "the public interest so demands." *Id.* r. 11-100.4(4)(b). He may also refuse use of the facilities when, "in the director's judgment," the use "would be disruptive of official state business or of the public health, safety and welfare." *Id.* r. 11-100.4(5).

An applicant submits an online form to the Capitol Complex events coordinator at least 30 days before the event. [ECF No. 3-17 at 2]. The coordinator places the event on the calendar and later sends the applicant a memorandum of understanding ("MOU"). Tr. 75. The event may proceed only after the applicant signs the MOU and the Department countersigns it. [ECF No. 29-1 ¶¶ 5–6]. The events coordinator handles routine applications, such as a small display, while larger events, such as a multi-day celebration, go to the Director. Tr. 58, 76.

The 2024 version of the MOU contained the provision at the center of this case. Section 5.15 of that version provided that "[b]ecause the Capitol Complex is often a destination for children . . . visual displays, sounds, and other actions that are harmful to minors including, but not limited to, obscene materials . . . and gratuitous violence or gore are not permitted." [ECF No. 3-3 at 50]. The provision defines both categories using the familiar elements of obscenity: material that the average person would find appeals to the prurient interest, is patently offensive, and lacks serious literary, scientific, political, or artistic value. *Id.*

In July 2024, after TST applied to host a multi-day event, the Department amended its policy to limit events to a single day and each group to one event per year. [ECF No. 3-2 ¶ 15]. The Department revised the MOU again effective July 1, 2026. Tr. 58–59. The July 2026 revision distinguished between indoor and outdoor events and allowed the latter to span multiple days, but it left the rules governing indoor displays unchanged. Tr. 59–60, 79–80.

*B. TST's Earlier Capitol Events*

In December 2023, TST participated in a holiday display at the Capitol alongside other religious and nonreligious groups. [ECF No. 3-2 ¶ 9]. TST's display featured a statue of Baphomet and drew controversy. *Id.* ¶¶ 6, 10. A man from Mississippi traveled to Iowa and destroyed the statue. *Id.* ¶ 11. He was charged with third-degree criminal mischief. *Id.*

In July 2024, TST applied to hold a four-day reading of John Milton's *Paradise Lost*, which it considers a core religious text. [ECF Nos. 3-3 at 18–20; 3-4 at 18–20]. After TST applied, the Department adopted the one-day, one-event policy and applied it to TST's pending application, sending an MOU for a one-day reading instead of four. [ECF No. 3-2 ¶ 15]. TST withdrew the application so that it could hold a holiday event later that year. Tr. 39.

*C. The 2024 Application*

On October 7, 2024, TST applied to hold a "holiday display" in the Capitol Rotunda on December 14, 2024. [ECF No. 3-3 at 42]. The application described the event as including "ritual, Krampus costumes, caroling, and other family-friendly activities such as coloring pages, and make and take ornaments." *Id.* The Department sent TST an MOU, which TST signed and returned later that month. [ECF No. 3-2 ¶ 19]. When TST asked about the status of the MOU, the events coordinator responded that the "MOU is with leadership." *Id.* ¶ 20. TST followed up again a week later but received no response. *Id.* On December 3, the Department requested more information,

including details of the costume contest. *Id.* ¶ 22. TST responded with a description of the contest and photographs of anticipated costumes, which show figures in full-body, horned costumes with masks covering their faces, bells at their waists, and bundles of sticks in hand. [ECF No. 3-3 at 34–35, 69–70].

On December 10, then-Director Adam Steen denied the application, citing Administrative Rule 11-100.4(5) and Section 5.15 of the MOU. *Id.* at 92. TST asked what element of the event was at issue and whether it could modify the event. *Id.* at 92–93. Steen responded that "[t]he cumulative circumstances that occur within the State Capitol building, including the presence of minors, coupled with the anticipation of costumes with sticks used as weapons on children, positions the event to be harmful to minors." *Id.* at 96. TST answered that the sticks were "a traditional costume component and for appearance only," and it offered to omit the costume contest and resubmit the application. *Id.* at 97. TST followed up the next day. *Id.* The record contains no response from the Department.

*D. The 2025 and 2026 Applications*

Steen left the Department in August 2025, and Mark Campbell succeeded him as Director that October. [ECF Nos. 29-1 ¶ 1; 36-3 ¶ 2]. Shortly before Director Campbell took office, TST applied to hold the same holiday event in December 2025. [ECF No. 3-2 ¶ 35]. When the Department asked for details, TST submitted the same costume photographs it had provided the year before. [ECF No. 29-1 ¶ 13]. In November, the Department denied the application in a two-sentence email: "This request is not approved. If you have any questions, contact Director Campbell." [ECF No. 3-5 at 48]. TST did not contact Director Campbell, and it held the event, including the costume contest, at a different location. Tr. 24–25.

In March 2026, TST submitted a third application, seeking to hold the event on December 12, 2026. [ECF No. 3-7 at 13]. Apart from an automated confirmation, the Department did not respond until July, when it sent TST an MOU to complete and sign. [ECF No. 3-2 ¶ 44]. TST returned the signed MOU less than one week later. *Id.* ¶ 45. In September, after TST filed this lawsuit and moved for a preliminary injunction, the Department denied the application in the same two-sentence email it had sent in 2025. [ECF No. 25-1]. Director Campbell attests that he denied the 2026 application "for the same event." [ECF No. 29-1 ¶ 15].

*E. Procedural History*

TST filed this lawsuit on August 13, 2026, bringing claims under 42 U.S.C. § 1983 against Director Campbell for violations of its rights to free speech, free exercise, and equal protection, along with claims against all Defendants under the Iowa Civil Rights Act and the Iowa Religious Freedom Restoration Act. [ECF Nos. 1; 9-1]. TST moved for a preliminary injunction the same day. [ECF No. 3]. Before the hearing, Steen moved to quash TST's subpoena requiring him to testify, arguing that he played no role in the 2025 and 2026 decisions. [ECF No. 36]. The Court denied the motion. [ECF No. 44].

At the October 6 hearing, the Court heard testimony from Lucien Greaves, a co-founder of The Satanic Temple; Adramelech; Steen; and Director Campbell. The Court admitted four exhibits: a video of a November 24, 2025, campaign event at which Steen spoke; Director Campbell's declaration; excerpts of public records produced by the Department; and an October 2025 news article quoting Steen. Tr. 6–8, 45; Pl. Exs. 1–4.

A week after the hearing, Defendants filed a notice responding to questions the Court raised at the hearing. [ECF No. 48]. The notice attached a supplemental declaration from Director Campbell and a list of other event applications showing when the Department sent each applicant

an MOU. [ECF Nos. 48-1; 48-2]. TST asks the Court to strike the filing or, alternatively, to give it no weight. [ECF No. 50]. Defendants did not seek leave to supplement the record, and TST had no opportunity to cross-examine Director Campbell about his new declaration. The Court declines to strike the filing but considers it with those limits in mind.

## II. DISCUSSION

### *A. Legal Standard*

A court deciding whether to grant a preliminary injunction weighs four factors: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the injury an injunction would inflict on other parties; (3) the movant's probability of success on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). The movant bears the burden of establishing that an injunction is warranted. *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022). Likelihood of success on the merits is the most significant factor. *Novartis Pharms. Corp. v. Hanaway*, 180 F.4th 1097, 1106 (8th Cir. 2026). But even in First Amendment cases, a likely violation does not relieve the movant of its burden to show irreparable harm; a separate inquiry is required. *Maixner v. Eidsness*, 182 F.4th 736, 738–39 (8th Cir. 2026) (per curiam).

The parties dispute how strong a showing TST must make on the merits. Ordinarily, a movant need only show a "fair chance" of prevailing. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). A movant seeking to enjoin "government action based on presumptively reasoned democratic processes," such as a statute or regulation, must instead show that it is "likely to prevail." *Id.* at 732–33.

Defendants argue that the stricter standard applies because the Director acted under a statutory and regulatory scheme. [ECF No. 29 at 12–13]. The Court disagrees. TST does not

challenge the Department's regulations. It challenges the Director's individual decisions to deny its applications, made under a standard that commits the matter to "the director's judgment." Iowa Admin. Code r. 11-100.4(5). Those decisions are not the product of a democratic process. *See Powell v. Noble*, 798 F.3d 690, 698 (8th Cir. 2015) (applying the fair-chance standard to informal rules governing speech at the Iowa State Fair). The outcome would be the same under either standard, however, because TST has shown that it is likely to prevail.

*B. Likelihood of Success on the Merits*

1. The Forum

The government's power to restrict speech on its own property depends on the nature of the forum. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797, 800 (1985). Traditional public forums, such as streets and parks, have long been devoted to assembly and debate. *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)). A designated public forum exists when the government intentionally opens a nontraditional forum for public discourse. *Cornelius*, 473 U.S. at 802. In either, content-based restrictions must survive strict scrutiny. *Sessler v. City of Davenport*, 102 F.4th 876, 881–82 (8th Cir. 2024).

A limited public forum arises when the government opens property for expression but reserves it "for certain groups or for the discussion of certain topics." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). The government's power there is greater but "not without limits." *Id.* Any restriction "must not discriminate against speech on the basis of viewpoint," and it "must be 'reasonable in light of the purpose served by the forum.'" *Id.* at 106–07 (quoting *Cornelius*, 473 U.S. at 806); *see also Powell*, 798 F.3d at 699–700.

TST contends that the Capitol Rotunda is a designated public forum, relying on decisions treating the Capitol and its grounds as open for expression. [ECF Nos. 11-1 at 8; 33 at 5–6]. Defendants contend that the Rotunda is a limited public forum for purposes of hosting events. [ECF No. 29 at 14–15]. The Court need not resolve that dispute at this stage. It assumes, for purposes of this motion, that the Rotunda is a limited public forum, the classification more favorable to Defendants, because the Department's denial is likely unconstitutional even under that standard.

2. The Harmful-to-Minors Rationale

Defendants justify each denial on a single ground: that the event would be harmful to minors under Section 5.15 of the MOU. [ECF No. 29 at 16–19]. That rationale likely fails. The concern Director Campbell described rests on what the Krampus character means and whether it might frighten children, which is not a permissible basis for excluding speech. And to the extent the concern rests on the sticks carried as part of the costumes, it cannot justify denying the entire event.

a. The Basis for the Denials

Director Campbell testified that he denied the 2025 and 2026 applications because they were identical to the application denied in 2024. Tr. 52, 56–57, 82–83, 93. His explanation of that reasoning, however, varied. When the Court asked whether his "entire reasoning" and "sole reason" for the denials was that the applications matched the 2024 application, he agreed. Tr. 93. Moments later, defense counsel asked whether he had "independently reviewed and thought about" the applications or had "just rubber-stamped a prior decision." He then offered a different explanation: Department staff had told him the 2024 application was denied for "fear of harm to children," he looked at the application, and he concurred. Tr. 57–58, 94. Earlier in his testimony,

he described the reasons for the 2024 denial as "the costume contest and the weaponry that was displayed and the potential harm to kids." Tr. 82. Throughout his testimony, he maintained that he did not independently evaluate whether the costumes would harm children, and that he did no research on Krampus. Tr. 56–57, 93–94.

Director Campbell's decision nonetheless reflected his own understanding of Krampus. He acknowledged that the folklore surrounding Krampus played a role in his decision, explaining that his understanding of Krampus involves "the harming of children and taking them to hell." Tr. 87. That understanding came from what he had heard growing up, not from any study of the subject. *Id.* He also testified that "[h]arm's a big word" that can include scaring a child, and that psychological harm could be the same as physical harm, although he was unsure whether psychological harm alone would justify denying TST's event. Tr. 77–78.

Former Director Steen described the 2024 decision in similar terms. He testified that the costume contest concerned him because the photographs showed rods "that could be used as weapons against children," and that he "made sure to understand what the purpose of Krampus was" in reaching his decision. Tr. 31, 37. He did not know whether the sticks were real or props, and he never asked TST. Tr. 31–32.

The Department's rationale thus has two strands. The first is that Krampus, as a character, might frighten children. The second is that the sticks carried by costumed participants might be used to strike them. Neither likely justifies the denial.

b. The Character of Krampus

The Supreme Court has repeatedly rejected the premise that the government may exclude protected expression to shield children from ideas or images it deems unsuitable. Minors are entitled to substantial First Amendment protection, and the government may restrict their access

to protected expression only in narrow and well-defined circumstances. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975). Speech "that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 213–14. A State possesses legitimate power to protect children from harm, "but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011).

Depictions of violence are no exception. *Brown* declined to recognize violent content as a category of speech unprotected for minors, and it confined the State's power to restrict material for minors to the sexual material at issue in *Ginsberg v. New York*, 390 U.S. 629 (1968). *Brown*, 564 U.S. at 793–94. The Court observed that the stories traditionally read to young audiences are often violent. Snow White's wicked queen is made to dance in red-hot slippers until she falls dead, Cinderella's evil stepsisters have their eyes pecked out by doves, and "Hansel and Gretel (children!) kill their captor by baking her in an oven." *Id*. at 796. A folklore figure who punishes misbehaving children belongs to the same tradition.

Section 5.15 itself reflects these limits. The two categories it names—obscene material and gratuitous violence or gore—both borrow the elements of obscenity. [ECF No. 3-3 at 51]. Defendants do not contend that a holiday folklore costume contest falls within either category. They rely instead on the provision's catch-all language. [ECF No. 29 at 19].

To be sure, *Brown* and *Erznoznik* concerned restrictions on distributing speech to the public, while this case concerns access to government property. That distinction matters. In a limited public forum, the State may reserve its property for the purposes to which it is dedicated,

and the Capitol's purposes include serving the many children who visit it. *See* [ECF No. 29 at 16–17].

But the State's latitude in a limited forum is not unbounded. A restriction must be reasonable in light of the forum's purpose, and the State must be able to articulate "some sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 16 (2018). In *Mansky*, a ban on "political" apparel at polling places failed that test, even in a nonpublic forum, because the State's "haphazard interpretations" left the term without workable limits. *Id.* at 16–17. The Court did not demand perfect clarity. *Id.* at 21. But it warned that an indeterminate prohibition invites abuse, particularly once officials have given it "a virtually open-ended interpretation." *Id.* (quoting *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987)).

Both Directors have applied Section 5.15 in a way that shares that defect. Director Campbell testified that harm is "a big word" that can include scaring a child. Tr. 77–78. Former Director Steen applied the same provision to deny a display of an oversized contraceptive, which he found "grotesque," and a drag show, which he likewise considered harmful to children. Tr. 33, 43, 50. His concern with the contraceptive display was not that anyone would use it to strike a child, but that he did not want children to see it. Tr. 43. Steen did not make the decision under review, but his decisions show how the Department has applied Section 5.15 in practice.

In *Mansky*, the Supreme Court looked to the State's own interpretations of its apparel ban in deciding whether the prohibition was capable of reasoned application. *See* 585 U.S. at 16–17. The Department's interpretations here point to the same conclusion. A standard that reaches whatever officials find frightening, grotesque, or unsuitable for children provides no "sensible

basis for distinguishing what may come in from what must stay out." *Id*. at 16. It turns instead on the officials' own reactions to the message.

The record also provides little factual support for the concern. Director Campbell's understanding of Krampus came from what he heard growing up. Tr. 87. Defendants point to news reports of Krampus parades in Europe that turned violent, but nothing in the record connects those events to a costume contest inside the Iowa State Capitol. [ECF No. 29 at 10]. What remains is a concern about how children might react to the character, and the Supreme Court has declined to permit the exclusion of protected expression from a forum serving children based on "what the youngest members of the audience might misperceive." *Good News Club*, 533 U.S. at 119.

c. Viewpoint

Director Campbell's objection to the Krampus character also raises a serious question of viewpoint discrimination. The government discriminates on the basis of viewpoint when it excludes a perspective on an otherwise permitted subject. *Rosenberger*, 515 U.S. at 829–31. In *Good News Club*, the Supreme Court held that a school that opened its facilities for discussion of children's moral development could not exclude a club that addressed the same subject from a religious perspective. 533 U.S. at 107–12. The Capitol has hosted holiday displays by religious and nonreligious groups, including Christmas trees, nativity scenes, and menorahs. [ECF No. 29 at 9]. Krampus comes from the same holiday tradition; Defendants themselves describe him as the folkloric "antithesis of St. Nicholas." *Id.* at 10.

Excluding Krampus costumes because they might frighten children, while admitting the season's celebratory displays, targets a perspective on the holiday rather than the holiday itself. The Supreme Court has held that disfavoring expression because it offends, or because officials judge it immoral or scandalous, is viewpoint discrimination. *Iancu v. Brunetti*, 588 U.S. 388, 393–

94 (2019); *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion) ("Giving offense is a viewpoint."). Excluding a costume because officials find it frightening rests on the same kind of judgment.

The objection fails either way. If it is viewpoint-based, it is impermissible in any forum. If it is merely content-based, it is still not a reasonable basis for excluding TST's event, for the reasons already explained.

d. The Costume Sticks

The costume sticks present a closer question, though Defendants have not settled on what the concern about them is. Steen's explanation for the 2024 denial cited "the anticipation of costumes with sticks used as weapons on children." [ECF No. 3-3 at 96]. In this litigation, however, Defendants disclaim any assumption that TST planned to use the sticks to strike children. They contend instead that costumed figures carrying "the sticks traditionally used to beat children" would be "distressing for children." [ECF No. 29 at 18–19]. That framing folds the sticks into the character-based concern the Court has already addressed. Director Campbell, by contrast, described the concern as physical. Asked whether it was "a concern that TST might hit kids with prop weapons," he answered, "The costume contest and props, yes." Tr. 54. To the extent the concern is distress, it fails for the reasons already explained.

To the extent it is physical, Defendants rely on *Powell*, in which a fairgoer challenged unwritten rules governing expression at the Iowa State Fair. 798 F.3d at 695. The Eighth Circuit held that the fair could likely enforce a rule barring signs attached to poles or sticks, which fair officials had adopted out of concern that the poles or sticks could be used as weapons. *Id.* at 695, 701–02. The court reached that conclusion even though the fair allowed tent poles, flagpoles, and food on sticks, finding those items different in kind from a sign pole. *Id.* at 702. *Powell* thus

illustrates that a concern about sticks being used as weapons can justify a restriction on speech. But the restriction upheld there differs from the Department's denial in three respects.

First, the State Fair rule applied to every visitor, regardless of message. *Id.* at 695, 701. The Department has no comparable rule. The MOU's list of prohibited items does not include sticks. [ECF No. 3-3 at 51]. Neither Director identified any rule restricting props that the Department applies to other events, and Director Campbell testified that he was aware of no other denial based on potential harm to children during his tenure. Tr. 86. The concern about sticks arose only in TST's case.

Second, the State Fair rule restricted an object, not a speaker. The plaintiff in that case remained free to speak and to carry his signs, so long as they were not mounted on poles. *Powell*, 798 F.3d at 701–02. The Department did not ask TST to leave the sticks behind, even though it routinely works with applicants to resolve concerns before deciding whether to approve an event. Tr. 61, 68, 73–74; Pl. Ex. 3. Rather, it denied the entire event, including the caroling, the ornaments, the coloring pages, and the ritual. [ECF Nos. 3-7 at 14; 25-1]. At the hearing, Director Campbell testified that if TST submitted the same application without the costume contest and without the weapons, he would see no reason it would not be approved, although he would need to review it again. Tr. 77, 82. In his supplemental declaration, he went further. He stated that he anticipated no problems with an application that omitted "the Krampus costumes and costume contest, which I determined were harmful to children." [ECF No. 48-1 ¶ 2]. The Department's objection, then, extends to the Krampus costumes themselves, not merely the sticks. Either way, the Department excluded far more expression than its stated concern could justify.

Third, the Department never looked into whether the sticks posed any real danger. Former Director Steen did not know whether the sticks were real or props, though he thought they looked

like they "could very well be real." Tr. 31. Director Campbell did not ask TST who would attend, what participants would wear, or whether TST had a security plan, and he performed no independent evaluation of whether the costumes posed any risk. Tr. 53–54, 57. Meanwhile, the Capitol already guards against the very danger the Department invokes. Everyone who enters passes through metal detectors staffed by security personnel who examine what visitors bring in and can stop items that are not allowed. Tr. 26, 66–67. A restriction "need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. But denying an entire event to guard against a danger the Department never examined, and that the Capitol's existing screening is designed to catch, is not reasonable.

e. TST's Decision to Not Modify Its Application

Defendants emphasize that TST never submitted an application without the costume contest, never contacted Director Campbell after the 2025 denial, and declined at the hearing to submit a modified application. [ECF No. 29 at 10–11]; Tr. 24–25, 133–34. Those facts do not change the analysis. And when TST offered to omit the costume contest in 2024, the Department never responded. [ECF No. 3-3 at 98].

The question is whether the Department lawfully denied the application TST submitted. A speaker is not required to strip its event of protected expression to gain access to a forum from which that expression was unlawfully excluded. The Department's willingness to approve a version of the event without the contest shows only that the contest was the basis for the denial. Whether that basis is lawful is the question the Court has already answered.

3. The Surrounding Circumstances

The circumstances surrounding the denials reinforce the conclusion that the harmful-to-minors rationale cannot sustain the 2026 denial. A facially neutral justification does not end the

inquiry when the record suggests it is "in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811. A court is not required to accept a government's explanation for a restriction on speech without further inquiry. *Neighborhood Enters., Inc. v. City of St. Louis*, 644 F.3d 728, 737 (8th Cir. 2011). The Court's conclusion does not depend on this evidence. It rests on the rationale Director Campbell gave for the decision under review. But the history of the 2024 denial, including Steen's statements, sheds light on the rationale Director Campbell adopted and confirms that it warrants no greater deference.

a. The 2024 Denial

The record contains substantial evidence that the 2024 denial was not driven solely by concern about the sticks. On December 9, a Governor's Office official asked Steen to bring over the images TST had submitted so the two could "talk through it." [ECF No. 3-3 at 76]. The Governor's Office and the Department then worked together to draft a "Legally Appropriate Statement" explaining the denial, and Steen denied the application on the evening of December 10. *Id.* at 79, 84, 95. At the evidentiary hearing, Steen confirmed that he met with the Governor's counsel about the application and that the two offices drafted a joint statement about the denial for anticipated press inquiries. Tr. 29, 40–42. That draft did not mention sticks or weapons. It said instead that "[t]his satanic event, which specifically targets children, is harmful to minors and so it was denied." [ECF No. 3-3 at 81]. Steen testified that he coordinated with the Governor's Office because the application had drawn public attention and he wanted the Department and the Governor's Office to take a consistent position. Tr. 48–49.

Steen's later public statements point in the same direction. At a November 2025 campaign event, he announced that "the Satanic ritual" had been denied again. Tr. 20; Pl. Ex. 1. He described his reasons for denying the event this way: "No more marketing to children. No more trying to

get them to create Satanic symbols, sing Satanic hymns, partake in Satanic rituals. No more having youth involved in costume contests and defending weapons, used to abuse youth." [ECF No. 3-3 at 122]. He also said that the 2025 application was denied for the same reasons as the 2024 application.[2] Tr. 28.

In an October 2025 news article, Steen was quoted discussing both the 2023 display and the 2024 policy change. He explained that, after several conversations, the Department allowed the Baphomet display rather than contest its free speech protection. Pl. Ex. 4. But he added that he later "changed the policy to make sure that we weren't going to lose a 'free speech' argument." *Id.* At the hearing, Steen testified that TST's events played no part in the policy change. He attributed it instead to displays that had remained in the Capitol for weeks at a time. Tr. 42–43, 45. When asked about the article, he said he did not recall where the quotation came from, and he did not recall issuing any statement disputing it. Tr. 45–46. He likewise testified that TST's religious beliefs played no part in the 2024 denial and that the ritual was not among his reasons. In his account, the costume contest was the reason. Tr. 34, 37. But when asked why he had emphasized Satanic symbols and hymns in his public remarks, he could not recall. Tr. 34.

Steen made these public statements after he left the Department, while campaigning for office. Tr. 35, 39; Pl. Ex. 1. And under his leadership, the Department approved TST's 2023 display and offered to approve a one-day reading of *Paradise Lost*. Tr. 38–39. Those facts lend some support to his testimony that TST's religious beliefs played no role in the 2024 denial. Still, the record as a whole suggests that the 2024 denial rested on more than the props. Steen

[2] In the same speech, Steen described the event as "filth" and "evil." Pl. Ex. 1. His testimony at the hearing was markedly more measured. He described TST as "very pleasant to work with" during the 2023 display and denied that its religious beliefs played any role in the 2024 decision. Tr. 34, 37–38. The Court weighs his testimony with that contrast in mind.

coordinated the denial with the Governor's Office, emphasized Satanic symbols, hymns, and rituals when he described the event to the public, and explained his policy change as a way to avoid losing a free speech argument.

b. The 2025 and 2026 Denials

As noted, the decision under review is Director Campbell's denial of the 2026 application, and Steen's motive cannot simply be attributed to his successor. When an official is replaced, relief against the successor depends on findings about the successor's own conduct. *Mayor of Phila. v. Educ. Equal. League*, 415 U.S. 605, 622 (1974). Steen testified that his statement about the 2025 denial was an assumption, and both men testified that they never communicated about TST or its applications. Tr. 28, 36, 83.

Director Campbell's own testimony, however, shows that his decisions carried forward the 2024 denial. As discussed above, he denied both applications because they matched the one Steen had denied, and he concurred in Steen's reasons without independently evaluating them. Tr. 57, 82, 93–94. A decision that adopts a predecessor's rationale without independent review is only as sound as the rationale it adopts.

The Department's handling of TST's applications also departed from its ordinary practice in two respects. First, the Department ordinarily responds to an application within about one business day. [ECF No. 3-2 ¶ 46(b)]; Pl. Ex. 3. Apart from an automated confirmation, TST received no response to its March 2026 application until July, more than four months later. [ECF No. 3-2 ¶¶ 41, 44]. Defendants' supplemental exhibit shows that the Department often sends MOUs months after an application arrives, and that it sent none until after the revised MOU took effect in July 2026. [ECF No. 48-2]. That evidence is consistent with Director Campbell's testimony that the Department held applications while it revised the MOU. Tr. 79–84. But it

addresses only when MOUs went out. It does not show that any other applicant waited months for any response at all.

Second, in each of the last three years, TST's application proceeded to an MOU and was then denied. [ECF Nos. 3-2 ¶¶ 19, 25, 35, 39, 44–45; 25-1]. Nothing in the record, including Defendants' supplemental exhibit, shows any other applicant treated that way. [ECF No. 48-2].

The Department also treated TST's application differently from others that raised concerns. Director Campbell agreed that the Department works with applicants to make their events possible. Tr. 61, 68. The records in Plaintiffs' Exhibit 3 reflect that practice. In them, the events coordinator contacted applicants before any decision on their applications and proposed changes that would allow their events to go forward. Pl. Ex. 3. When the organizers of an America 250 event proposed displaying a glass flag worth nearly $1 million outside, next to an area where children would be painting rocks, the Department reached out to the group and proposed moving the flag inside for safety. Tr. 73–74. Director Campbell acknowledged the difference between that response and the one TST received, though he denied treating TST differently. Tr. 74. TST received no comparable outreach. It received a denial, followed by an invitation to ask about it. [ECF No. 25-1]; Tr. 53, 68.

Defendants note that the outreach in Exhibit 3 mostly concerned procedural matters such as dates and times, and Director Campbell testified that he had given the same invitation to other applicants. Tr. 69–70, 85. Even so, nothing in the record shows that the Department ever told TST what would make its event acceptable before denying it. Director Campbell testified that TST's offer to drop the costume contest had never been brought to his attention. Tr. 60, 77.

None of this requires a finding that Director Campbell personally acted out of hostility toward TST's beliefs, and the Court makes no such finding. The circumstances matter for a

narrower reason. They reinforce the concern that the Department has applied the harmful-to-minors rationale to disapprove of TST's message, not to make a neutral judgment about safety. But the Court's conclusion rests on the rationale itself. That rationale cannot support the 2026 denial.

4. The Remaining Claims and the Proper Defendant

Because TST has shown a likelihood of success on its free speech claim, the Court need not address its free exercise and equal protection claims. *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019).

TST also seeks relief on its state-law claims, but those claims cannot support the injunction. The Eleventh Amendment bars a federal court from granting relief, prospective or retrospective, against state officials on the basis of state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). TST responds only that the Court has supplemental jurisdiction over those claims. [ECF No. 33 at 8]. But supplemental jurisdiction does not override the Eleventh Amendment. *Pennhurst*, 465 U.S. at 121; *see also Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 541–42 (2002). TST does not argue that Iowa has waived its immunity from suit in federal court. The injunction therefore rests solely on TST's First Amendment free speech claim. This conclusion does not affect TST's state-law claims for damages against Steen in his individual capacity, which are not at issue on this motion.

The injunction runs only against Director Campbell in his official capacity. A suit against a state official in his official capacity for prospective relief from an ongoing violation of federal law may proceed notwithstanding the Eleventh Amendment. *Ex parte Young*, 209 U.S. 123, 159–60 (1908). The Department itself is immune from suit in federal court. *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007). And Steen, who left the Department in August 2025 and holds

no authority over Capitol events, is sued only in his individual capacity and could not grant the relief TST seeks. Tr. 35.

### *C. The Remaining* Dataphase *Factors*

A likely First Amendment violation does not by itself establish irreparable harm. TST must make a clear showing that it is likely to suffer irreparable harm absent preliminary relief. *Maixner*, 182 F.4th at 739. The loss of First Amendment freedoms, even for a short time, "unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). But that principle applies where First Amendment interests are "either threatened or in fact being impaired at the time relief was sought." *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 894 (8th Cir. 2024) (emphasis omitted) (quoting *Elrod*, 427 U.S. at 373). In *Maixner*, for example, the plaintiffs claimed no immediate threat to their speech; they sought damages and related relief for the nonrenewal of campsite leases, a harm money could repair. 182 F.4th at 739.

TST's claimed harm is of a different kind. TST does not seek redress for a past injury that money can repair. It seeks to hold a particular expressive event, in a particular place, on a particular date: its holiday event in the Rotunda on December 12, 2026. The Department's denial forecloses that expression. If relief does not issue before then, the opportunity will be lost, and no later judgment can restore it. A holiday event held after the holiday is not the same event. Nor is the threat speculative. The Department has denied the same event in each of the last three years, most recently in September—after this lawsuit was filed. [ECF No. 25-1]. TST has shown that its First Amendment interests are being impaired now and that the opportunity to exercise them will be lost absent relief.

Defendants argue that TST suffers no irreparable harm because it can hold the event elsewhere, as it did in 2025. [ECF No. 29 at 25–26]. But "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939). Requiring TST to hold the event elsewhere would not alleviate the irreparable nature of the harm; it would merely relocate the speech while permitting the likely constitutional violation to persist.

When the government is the opposing party, the balance of harms and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]t is always in the public interest to protect constitutional rights," and "the balance of the equities generally favors the constitutionally-protected freedom of expression." *Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025) (quoting *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019)). Defendants invoke the State's interests in protecting children and in managing its property. [ECF No. 29 at 26]. The injunction leaves those interests intact. The Department may impose the same conditions it applies to other indoor events, and participants' props remain subject to the Capitol's ordinary security screening. What the Department may not do is exclude the event because Director Campbell understands Krampus to be a figure who harms children and takes them to hell.

*D. Bond*

A court may issue a preliminary injunction "only if the movant gives security" in an amount the court considers proper to cover the costs and damages of any party wrongfully enjoined. Fed. R. Civ. P. 65(c). The Court has discretion over the amount of the bond, and courts in this Circuit have waived the requirement in cases vindicating important constitutional rights. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016); *Bus. Leaders in Christ v. Univ. of Iowa*, No. 3:17-cv-00080-SMR-SBJ, 2018 WL

3688981, at *1–2 (S.D. Iowa Jan. 23, 2018). Defendants contend that a bond is mandatory and request one covering security, liability insurance, and a $10,000 damage deposit. [ECF No. 29 at 26]. At the hearing, however, Defendants acknowledged that the MOU already allows the Department to require those protections. Tr. 126–27. Because the Department's own procedures address the costs it identifies, and Defendants have offered no evidence of any other damages they would sustain, the Court waives the bond requirement.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction is GRANTED. [ECF No. 3].

IT IS ORDERED that Defendant Mark Campbell, in his official capacity as Director of the Iowa Department of Administrative Services, and his officers, agents, employees, and all other persons in active concert or participation with him who receive actual notice of this Order, are ENJOINED from denying Plaintiffs' March 2026 application, as submitted, to hold their holiday event in the Iowa Capitol Rotunda on December 12, 2026.

IT IS FURTHER ORDERED that within seven days of this Order, Defendant Campbell shall approve Plaintiffs' application and countersign the memorandum of understanding Plaintiffs signed and returned in July 2026. Defendant Campbell may impose only those conditions that the Department applies to other indoor events at the Capitol, such as security, insurance, and damage-deposit requirements. Defendant Campbell shall not prohibit, restrict, or condition the event, including its costumes, costume contest, and props, on the basis of its content or message. Any props carried by participants are subject to inspection at the Capitol's security screening on the same terms as any other item brought into the building.

IT IS FURTHER ORDERED that within ten days of this Order, Defendant Campbell shall file a notice identifying any conditions imposed on the event and confirming that the Department applies those conditions to other indoor events at the Capitol. Plaintiffs may file any objection within five days of that notice.

IT IS FURTHER ORDERED that the bond requirement under Federal Rule of Civil Procedure 65(c) is WAIVED.

IT IS SO ORDERED.

Dated this 2nd day of November, 2026.

STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT